# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHANIE STUM,<br> Plaintiff<br><br>  v.<br><br>BRIAN THOMPSON, Superintendent of SCI<br>Mercer, and MICHELLE WAGNER,<br>Corrections Classification and Program<br>Manager of SCI Mercer,<br> Defendants. | Civil Action No. 2:17-cv-404 |

## MEMORANDUM OPINION and ORDER

The above captioned case came on for hearing on April 24, 2017 on Plaintiff's request for injunctive relief preventing the defendants from denying her request to marry a prison inmate.

Pursuant to Rule 65 (a)(2) the parties have agreed that the trial on the merits be advanced into these proceedings. Following the hearing and review of the documents of record, we make the following:

## FINDINGS OF FACT:

1. Stephanie Stum, an unmarried woman over the age of 18 who wants to marry Wayne Black-Rhoden, an inmate in the custody of the Pennsylvania Department of Corrections ("DOC") currently housed at the State Correctional Institution at Mercer ("SCI Mercer").

2. Mr. Black-Rhoden is an unmarried man over the age of 18 and is a legal permanent resident of the United States having emigrated from Costa Rica as a teenager.

3. Ms. Stum, who lives in Cumberland County, visits Mr. Black-Rhoden at SCI Mercer twice a month. They speak on the phone daily and frequently write to one another.

4. Ms. Stum and Mr. Black-Rhoden seek to marry each other.

5. Mr. Black-Rhoden pleaded *nolo contendere* to charges of statutory sexual assault and corruption of a minor in February 2016. The victim was Ms. Stum's sister, who was fifteen years of age at the time of the crime. He was sentenced to one to two years imprisonment to be followed by four years' probation.

6. Mr. Black-Rhoden entered Department of Correction ("DOC") custody in March 2016 and has been housed at SCI Mercer since May 2016.

7. Since entering DOC custody, he has had no misconducts.

8. The DOC recommended that Mr. Black-Rhoden complete the following: a Sex Offender Program Evaluation, a Sex Offender Low Intensity Program, and Thinking for a Change program at the institution.

9. Mr. Black-Rhoden completed the Sex Offender Program Evaluation on May 24, 2016; he completed the Thinking for a Change Program which is a 25-session program that utilizes cognitive restructuring and social skills interventions as methods of changing criminal thinking, on September 20, 2016.

10. The DOC offers two types of sexual treatment programming based on the Medlin Responsible Living curriculum, one for low-risk offenders and another for moderate-to-high risk offenders. The sexual treatment program for low-risk offenders is referred to as low intensity.

11. The curriculum for sexual treatment programming for low-risk offenders uses three phases of the Medlin program while the curriculum for moderate-to-high risk offenders uses seven phases of the Medlin program.

12. The low-intensity sexual treatment programming generally takes about eight months for inmates to complete.

13. Inmates in the low-intensity program meet in group counseling sessions for approximately two hours each week and complete homework.

14 Mr. Black-Rhoden has been participating in the Sex Offender Low Intensity Program at SCI Mercer since November 2016 and is scheduled to complete the program on June 19, 2017.

15. SCI Mercer staff has recommended that Mr. Black-Rhoden be granted parole once he completes the sexual treatment program.

16. Under Pennsylvania law, Mr. Black-Rhoden must complete a sexual treatment program to be eligible for parole. 42 Pa. Cons. Stat. § 9718.1.

17. Mr. Black Rhoden is scheduled to meet with the Parole Board in July 2017.

18. James Harrington, a regional licensed psychologist manager with the DOC, testified that the primary purpose of the sexual treatment program is to prevent individuals from re-offending.

19. The Department of Corrections has a legitimate penological interest in requiring inmates convicted of sex offenses to participate in sexual treatment programming.

20. The DOC has a policy governing inmate marriage which is set forth in DC-ADM 821 and an inmate may not marry without prior DOC approval.

21. Amongst other things, the Marriage Policy sets out the requirements for permitting inmates to marry and the process for inmates to follow to submit a marriage request.

22. According to Section 1(A) of the Marriage Policy, the DOC will approve requests by inmates to wed while incarcerated provided:

    a. The inmate is able to be interviewed in person or by video by a representative

from a local county office responsible for issuing marriage licenses (Marriage License Bureau, Orphans Court Clerk, Prothonotary or Register of Wills);

  b. The inmate and/or his/her fiancé/fiancée must pay all costs associated with security, procuring the marriage license, and arranging for someone to officiate at the wedding;

  c. There are no legitimate penological interests that would be adversely affected if an inmate and his/her fiancé/fiancée were to be married.

23. The facility manager will deny a marriage if:

  a. The process to obtain a marriage license requires transporting an inmate out of the facility, thus creating a risk of escape;

  b. The inmate has not completed any applicable mandatory sexual treatment Program;

  c. It is determined, through information provided by the Office of the Victim Advocate (OVA) and other sources, that the inmate's fiancé/fiancée was the victim of the inmate's crime and the nature of the crime raises sufficient doubt as to the true motives of the inmate;

  d. The fiancé/fiancée is expected to testify for/against the inmate;

  e. There are other significant situations, similar to those listed above, which would warrant the denial of a marriage for a period of time.

24. In order to get married, an inmate must submit a request in writing to his counselor. The counselor then submits final plans to the Facility Manager or his designee for approval of the date, time, and place of the ceremony.

25. Mr. Black-Rhoden made a request for permission to marry to his counselor, Aaron Diaz, on or about December 7, 2016.

26. Mr. Diaz told Mr. Black-Rhoden on or about December 21, 2016, that the DOC would not permit Mr. Black-Rhoden to get married until he completes his sexual treatment programming.

27. Ms. Stum sent a letter on January 9, 2017, to Defendant Brian Thompson, the superintendent of SCI Mercer, asking him to waive the requirement that Mr. Black-Rhoden complete the sexual treatment program before getting married explaining that Mr. Black-Rhoden was in danger of being ordered deported unless they married.

28. As a result of his criminal conviction, Mr. Black-Rhoden was placed in removal proceedings in immigration court to determine whether he should be removed from the United States and his hearing is scheduled for May 10, 2017.

29. If the couple marries, Ms. Stum will be able to file a spousal petition for an immigrant visa on behalf of Mr. Black-Rhoden which if granted would allow him to remain in the United States.

30. If Mr. Black-Rhoden is ordered deported, he will be permanently barred from ever returning to the United States. 8 U.S.C. § 1182(a)(9)(A).

31. Ms. Stum maintains that she wishes to marry Mr. Black-Rhoden now, rather than wait until after June 19, 2017 – when he is scheduled to complete his sexual treatment programming – so that they will have a chance to live together as husband and wife in the United States once he is released.

32. Defendant Michelle Wagner replied to Ms. Stum's letter to Defendant Thompson on January 19, 2017, stating that Mr. Black-Rhoden "will not be approved to be married until he

5

has completed his mandatory Sex Offender Programming" pursuant to DOC policy.

33. Defendant Wagner further stated in the letter that Mr. Black-Rhoden may notify his counselor that he desires to pursue the marriage after he has completed the program.

34. As Superintendent of SCI Mercer, Defendant Thompson is the facility manager.

35. Under the Marriage Policy, Defendant Thompson may deny an application by an inmate to marry if the inmate has not completed any mandatory sexual treatment program.

36. Defendant Thompson will not approve Mr. Black-Rhoden's request to be married until Mr. Black-Rhoden completes the sexual treatment program because that is DOC policy.

37. Defendant Thompson testified that there are no other reasons besides the fact that Mr. Black-Rhoden has not yet completed the sex offender treatment program why he would not permit Ms. Stum and Mr. Black-Rhoden to be married.

38. Defendants Thompson and Wagner have at all relevant times been acting under color of state law in their official capacities.

39. In addition to the sexual treatment program, the DOC offers multiple treatment programs to inmates, including Alcohol and Other Drugs treatment programs, Thinking for a Change, Violence Prevention, Batterer's Intervention, which addresses domestic violence, and the InsideOut Dad Parenting Program.

40. Mr. Harrington, the Psychologist Manager for the DOC testified that he was not aware of any other programming besides the sexual treatment that any inmate must complete before getting married.

41. He also testified that the mandate that inmates complete a sexual treatment program before they will be granted permission to marry was added to the Marriage Policy in 2011, and he has no personal knowledge as to why it was added.

42. Mr. Harrington also testified that he knows of no legitimate penological interest in requiring Mr. Black-Rhoden complete the program prior to marrying the plaintiff and that his personal belief is that Mr. Black-Rhoden will complete the program.

43. Reverend Ulli Klemm, the DOC administrator of religion and volunteer services, testified at his deposition that the requirement that inmates complete sexual treatment before getting married was
added on the advice of legal counsel.

44. Defendants Thompson and Wagner testified that they do not know why the Marriage Policy requires inmates to complete a sexual treatment policy before they can get married.

45. Rev. Klemm testified that he is the "go-to person to make suggestions for policy change or to seek clarification" of the Marriage Policy.

46. Rev. Klemm also testified that he does not know why the Marriage Policy requires inmates to complete a sexual treatment program before they can get married.

47. Inmates who are married do not receive any additional benefits or privileges compared to unmarried inmates. For example, married inmates do not receive any additional visits with their spouses or any additional time during visits with their spouses.

48. All visits between inmates and non-inmates are supervised, regardless of their marital status.

49. According to DOC Policy DC-812, Inmate Visiting Privileges Procedures Manual ("Visiting Policy"), inmates in general population are permitted contact visits in a relaxed setting, under the supervision of the assigned correctional officer.

50. An inmate and an individual visiting the inmate may share a brief kiss and

embrace when meeting and departing. This contact is permitted even if the individual visiting the inmate is not the inmate's spouse.

51. An inmate whether or not he/she is married who engages in inappropriate physical contact with any visitor jeopardizes both his own visitation privileges as well as those of the visitor.

52. A list of approved visitors is created for each inmate.

53. Stephanie Stum and her minor son are on Mr. Black-Rhoden's authorized visitor list at SCI Mercer and are permitted to have contact visits with Mr. Black-Rhoden.

54. Ms. Stum is also on Mr. Black-Rhoden's list of authorized telephone contacts.

55. The DOC will not permit Ms. Stum or her family to have any more contact with Mr. Black-Rhoden than they are currently permitted even if Ms. Stum and Mr. Black-Rhoden are married.

56. The DOC will not have to change any of its practices if Ms. Stum and Mr. Black-Rhoden are married.

57. There are no alternative avenues for Ms. Stum to exercise her right to marry Mr. Black-Rhoden prior to the completion of the sexual treatment program because he is in the continued custody of the DOC and must obtain permission from the DOC to apply for a marriage license and be married.

58. Until Ms. Stum and Mr. Black-Rhoden are married, Ms. Stum cannot file a spousal-based petition for an immigrant visa on behalf of Mr. Black-Rhoden.

59. Ms. Stum filed this lawsuit in the United States District Court for the Western District Court of Pennsylvania on April 3, 2017, to obtain an order allowing her to marry Mr. Black-Rhoden prior to his May 10, 2017 immigration hearing.

60. No evidence has been presented demonstrating that by permitting Ms. Stum to marry Mr. Black-Rhoden, the security of the prison or any of its concerns will be affected.

Conclusions of Law

The plaintiff commenced this action pursuant to the provisions of 42 U.S.C. § 1983 and invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331 and venue is proper in this Court. The plaintiff seeks an injunction against the defendants barring them from not permitting her to marry a prison inmate.

A plaintiff seeking injunctive relief must establish pursuant to Rule 65 of the Federal Rule of Civil Procedure: (1) a "reasonable likelihood" of success on the merits; (2) a likelihood of "irreparable harm" absent the relief sought; (3) the harm to Plaintiff by denying injunctive relief outweighs the harm to the defendants by granting such relief; and (4) injunctive relief would serve the public interest. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002).

The Supreme Court in Turner v. Safley, 482 U.S. 78 (1987) held that absent legitimate compelling penological objectives, the United States Constitution bars prison authorities from preventing an inmate from marrying. See also, Miller v. Wenerowicz, 648 Fed. Appx. 161 (3d Cir. 2016). No clear evidence has been presented as to why the sexual rehabilitation participation program prohibition to the marriage between the plaintiff and inmate Wayne Black-Rhoden would interfere with the sound orderly administration of the institution or serve any legitimate governmental interest justifying the imposition of that regulation. Thus it is clear that the plaintiff is likely to prevail on the merits if this matter proceeded further. Issa v. Sch. Dist. Of Lancaster, 847 F.3d 121, 131 (3d Cir. 2017).

There is no question that the harm to the plaintiff would be irreparable in that she and the prisoner would be barred from presenting their marriage claim to the Immigration authorities for

consideration in the deportation proceedings. It further appears that the harm to her would outweigh any harm, none of which has been demonstrated here, to the defendants.

Finally, in the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights. <u>Council of Alternative Political Parties v. Hooks,</u> 121 F.3d 876, 883-84 (3d Cir. 1997). In the instant case, the evidence supports the conclusion that no legitimate penological or institutional interest would be served by prohibiting the plaintiff's marriage from going forward.

Accordingly, the plaintiff's will be awarded the injunctive relief she seeks.

An appropriate Order will be entered.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHANIE STUM,<br>　　Plaintiff<br><br>　　　v.<br><br>BRIAN THOMPSON, Superintendent of SCI Mercer, and MICHELLE WAGNER, Corrections Classification and Program Manager of SCI Mercer,<br>　　Defendants. | Civil Action No. 2:17-cv-404 |

## ORDER

AND NOW, this 24th day of April, 2017, for the reasons set forth in the foregoing Findings of Fact and Conclusions of Law,

The defendants, their employees, their agents and any parties acting on their behalf are permanently enjoined from preventing the plaintiff from proceeding with her plans to marry Mr. Black-Rhoden prior to May 10, 2017 based on his failure to complete the low intensity sexual treatment program at his place of confinement.

　　　　　　　　　　　　　　　　　　　　s/ Robert C. Mitchell
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge